**UNITED STATES DISTRICT COURT
FOR PUERTO RICO**

RECEIPT # 110083
AMOUNT: $405.00
JAN 2 3 2024
CASHIER'S SIGNATURE

| |
|---|
| W. SCOTT GRECO, |
|     **Plaintiff,** |
| **v.** |
| **ERIC QUETGLAS JORDÁN,**<br>**QUETGLAS LAW OFFICE, P.S.C.,** |
|     **Defendants.** |

Civil Action No. 24-CV-1035 (MAJ)

RECEIVED & FILED
CLERK'S OFFICE
JAN 23 2024
US DISTRICT COURT
SAN JUAN, PR

<u>**COMPLAINT**</u>

COMES NOW Plaintiff, W. Scott Greco, *pro se*, who represents and alleges to this Honorable Court as follows:

**Parties**

1.  Plaintiff W. Scott Greco (hereafter Mr. Greco) is an individual who is a Virginia citizen residing at 3834 Lake Park Rd., Earlysville, Virginia 22936 during all relevant times.  His full name is William Scott Greco.  He has been employed as an attorney with Greco & Greco, P.C. since 1994.

2.  Defendant Eric Quetglas Jordán (hereafter Mr. Quetglas) is an individual who is a Puerto Rico citizen residing in San Juan and Guaynabo, Puerto Rico during all relevant times. Mr. Quetglas's last known home address is 100 Calle Del Muelle, 1705 Capitolio Plaza, San Juan, Puerto Rico 00901.  He is and has been employed as an attorney with Quetglas Law Office, P.S.C..

3.  Defendant Quetglas Law Office P.S.C. (hereafter QLO) is a professional corporation incorporated in Puerto Rico in 2014.  QLO is a law firm with its office and principal place of

business in Guaynabo and/or San Juan, Puerto Rico. Mr. Quetglas is the President of QLO and the authorized agent of QLO regarding all allegations herein. All references herein to Mr. Quetglas shall jointly include QLO, and vice versa.

### Jurisdiction and Venue

4. Diversity jurisdiction is appropriate pursuant to 28 U.S.C. § 1332. Complete diversity of citizenship exists between all Plaintiffs and all Defendants. The amount in controversy exceeds $75,000.00.

5. Venue is proper in this District because the underlying facts of this case involve agreements being performed in Puerto Rico and the legal representation of clients as co-counsel in Puerto Rico. As set out in more detail below, Defendants contracted with Plaintiff to provide legal services in Puerto Rico, Defendants breached those agreements in Puerto Rico, and Defendants committed torts and caused tortious injury in Puerto Rico by their acts or omissions within and outside Puerto Rico.

### Facts

6. Mr. Greco became licensed as an attorney in Virginia in 1994, and has practiced law with the law firm of Greco & Greco, P.C. as his primary employment since that time. He is also licensed in Washington, D.C. and Maryland, as well as multiple Federal District Courts and Appellate Courts. Since approximately 2000, Mr. Greco's primary area of practice has been representing customers against their stockbrokers, brokerage firms, financial advisors, and financial advisory firms in cases of securities fraud, fraud, negligence, breach of contract and other torts. Per brokerage agreements and FINRA Rules, the vast majority of these cases are filed and tried in FINRA arbitration (formerly known as NASD arbitration).

7.  Greco & Greco, P.C. (hereafter GG) is a professional corporation incorporated in Virginia in 1994.  GG is a law firm with its only office and primary place of business being in McLean, Virginia.  Plaintiff Mr. Greco is the President and authorized agent of Greco & Greco, P.C..  For good and valuable consideration, GG assigned all rights, claims, and causes of action it may hold against the Defendants based on the facts alleged herein to Mr. Greco on January 16, 2024.

8.  In 2013 Puerto Rico's municipal bond market and its Closed End Bond Fund (CEF) market experienced a significant crash and loss of value.  Because many Puerto Rican residents had their savings concentrated and overconcentrated in these markets as a result of the recommendations of local FINRA brokerage firms, including UBS Financial Services Inc. and UBS Financial Services Inc. of Puerto Rico (hereafter jointly "UBS") and Popular Securities, Inc., many customers had large amounts of their life savings wiped out.  As a result, upon information and belief, almost two thousand or more FINRA arbitration claims were filed on behalf of these customers against the FINRA firms involved.  All FINRA arbitration hearings are conducted in English, and the final hearings are held in the state/territory where the customer resided during the relevant time frame.  For this reason, Puerto Rico resident claims in FINRA arbitration were typically venued in San Juan, Puerto Rico.

9.  Mr. Greco was hired by one such Puerto Rico customer who had moved to the Virginia/DC area, and he represented her in FINRA arbitration #13-03048.  This FINRA arbitration which was venued in Washington D.C. was the first of the many Puerto Rico bond/fund arbitrations to go to a final hearing, and an arbitration award was issued in May 2015.  The successful award provided for payment of damages to the Mr. Greco's client by Respondent

UBS, and as a result of the award appearing in news publications, Mr. Greco was contacted by multiple potential new Puerto Rico clients who had not yet filed arbitration claims related to the Puerto Rico bond/fund crisis.

10. Because Mr. Greco was not licensed in Puerto Rico, he contacted a Puerto Rico attorney, Luis Minana, who had previously provided advice and aid to Mr. Greco in preparation for the prior FINRA hearing. Mr. Minana agreed to serve as Mr. Greco's local counsel for Mr. Greco's new FINRA arbitration clients from Puerto Rico. This agreement was reflected in the retainer agreements with the Puerto Rico clients that provided for 20% of the contingent attorney's fee to be paid to Mr. Minana.

11. Mr. Greco proceeded over the next several years to represent multiple Puerto Rico clients in FINRA arbitrations resulting in both successful settlements, and successful arbitration awards in cases that did not settle. During this time frame from 2015 to 2018, Mr. Greco met Defendant Mr. Quetglas who was working with Mr. Minana on their own customer FINRA arbitration claims. Although Mr. Minana and Mr. Quetglas did not work in the same law firm, they worked together as partners and co-counsel on a significant number of FINRA arbitrations they had jointly filed on behalf of customers harmed by the Puerto Rico bond/CEF crash.

12. On August 7, 2018 Mr. Minana called Mr. Greco who was in Washington, DC in a mediation, and advised him that Mr. Minana and Mr. Quetglas had decided to ask Mr. Greco to work with them on certain FINRA arbitrations of theirs that had not settled and were going to a final hearing in arbitration. Mr. Minana and Mr. Quetglas had tried several of their clients' FINRA arbitrations at this point, one of which was with another co-counsel. Mr. Minana explained that in his cases with Mr. Quetglas, they split their contingent attorney's fees with 50%

paid to each, but in cases in which they were requesting Mr. Greco to joint them as co-counsel,

they proposed paying out the attorney's fee at one-third each to Mr. Minana, Mr. Quetglas, and

Mr. Greco.  Mr. Greco agreed to this proposed oral offer thus forming a contract.  This oral

agreement and contract for Mr. Greco to work as co-counsel with Mr. Minana and Mr. Quetglas

for one third of the attorney's fee on agreed cases was also confirmed by multiple conversations

with Mr. Quetglas over subsequent years, as well as being confirmed through performance of the

contract with Mr. Quetglas and Mr. Minana paying Mr. Greco one-third of the attorney's fee

upon conclusion of the cases where a settlement or award was paid.

13.  Mr. Greco agreed to the proposed agreement from Mr. Minana and Mr. Quetglas in

regard to Mr. Greco working as co-counsel for designated arbitrations for one third of the total

attorney's fee, and immediately began preparing with Mr. Minana and Mr. Quetglas for an

arbitration hearing set for September 2018.

14.  Thereafter, over the next several years, Mr. Greco was asked to join as co-counsel by

and with Mr. Minana and Mr. Quetglas in a significant number of FINRA arbitrations, some of

which ended up being tried at a final hearing with successful awards, and many being settled

before the final hearing with successful settlement payments to the FINRA arbitration clients.

These awards and settlements added up to many millions of dollars of payments to the FINRA

arbitration clients involved, including one successful arbitration award of almost five million

dollars.  In all of these arbitrations except one which will be discussed below, the verbal

agreement and contract between Mr. Minana, Mr. Quetglas, and Mr. Greco was that each co-

counsel would be paid one-third of the contingent attorney's fee, and this contract and agreement

was confirmed by performance with Mr. Greco being paid one-third of the attorney's fee in those

cases by Mr. Quetglas and Mr. Minana for which he was asked to join as co-counsel.

15.    In 2020 Mr. Greco was paid one-third of the attorney's fees for approximately five different Minana/Quetglas arbitrations in which Mr. Greco was requested to join and agreed to join as co-counsel under the oral agreement above.  One of these, FINRA Arbitration 18-02391, was an arbitration that was tried by Mr. Quetglas and Mr. Greco with an award issued in favor of the client of Mr. Quetglas and Mr. Greco in 2020.  Mr. Quetglas requested and set up the payment of the award by UBS so that it was paid one-third each to the Trust Accounts for Mr. Quetglas, Mr. Minana, and Mr. Greco.  The three attorneys then deducted their attorney's fee and costs, and paid the remainder to the client.  Another 2020 case in which Mr. Greco was asked to join as co-counsel, FINRA Arbitration 18-00358, was settled prior to the final hearing, and Mr. Minana and Mr. Quetglas again had the settlement funds paid in thirds to the three attorneys' Trust Accounts, with each attorney, including Mr. Greco, ultimately paying out and receiving a third of the attorney's fees.

16.    In the co-counsel cases that went to a final arbitration hearing, the three attorneys would split up responsibilities related to the arbitration, however Mr. Greco would typically be responsible for the preparation of the primary general pre-hearing Brief, the assembly of documents produced in discovery to be numbered and placed into Exhibit Books, and the cross-examination of the most difficult witnesses at the hearings including the advisors/brokers involved, supervisors, and Respondent expert witnesses.  Mr. Greco also provided and used multiple general Exhibit books that he had spent years compiling relating to the bond/fund claims against UBS.  Mr. Greco also typically took on responsibility for the cross-examination of the most difficult Respondent witnesses because he had significantly more experience trying

-6-

FINRA arbitrations.

17.  In all of the cases which Mr. Greco joined as co-counsel with Mr. Minana and Mr. Quetglas, Mr. Greco was admitted *pro hac vice* for the arbitrations through application to the Puerto Rico Supreme Court by Mr. Minana's and Mr. Quetglas's offices, and Mr. Greco paid or reimbursed the filing attorneys the *pro hac* fees (typically $800.00 per arbitration).

18.  The one exception to the one-third split fee agreement for Mr. Greco working as co-counsel referenced above involved FINRA Arbitration No. 14-01134 which involved a significant amount of claimed damages incurred by Juan Félix Trinidad-García and his father, Juan Félix Trinidad-Rodríguez while at Wells Fargo and Popular Securities (hereafter the Trinidad arbitration).

19.  Although Mr. Minana had discussed generally with Mr. Greco the possibility of him joining as co-counsel in the Trinidad arbitration, Mr. Quetglas called Mr. Greco by phone on September 18, 2018 to specifically discuss it.  Mr. Quetglas asked Mr. Greco to join him and Mr. Minana as co-counsel in the Trinidad arbitration.  Mr. Quetglas explained that the Trinidads had hired them to represent them in the Trinidad arbitration because their prior counsel could not also represent the Trinidads in a related state court case brought by Banco Popular.  The state court action was allegedly brought by Banco Popular against Mr. Trinidad-Garcia for amounts allegedly due under a line of credit which had been secured by the securities held at Popular Securities which had sustained major losses and were the subject of the Trinidad arbitration.

20.  Mr. Quetglas explained on the phone call that the attorneys (including Mr. Quetglas and his brother) who were representing Mr. Trinidad-Garcia in the state court action did not have any way to be paid since they were defending an action to collect the amount owed by Mr.

Trinidad-Garcia on the line of credit. Mr. Quetglas further stated that the only way the state court attorneys could be paid was on a contingency basis out of the contingent fee which hopefully would be paid out of an arbitration award obtained in the FINRA arbitration. For this reason, Mr. Quetglas told Mr. Greco that rather than paying Mr. Greco one-third of the contingency fee in the Trinidad arbitration as co-counsel that had been the agreement in other cases, they could only agree to pay Mr. Greco 20% of the contingent fee since the contingent fee had to also be used to pay the state court attorneys.

21. In this and subsequent discussions about the contingent fee to be earned on any award from the Trinidad arbitration, Mr. Quetglas discussed the fee as if it was like any other standard contingent attorney's fee – i.e. a percentage of the amount recovered through settlement or award/judgment that would be paid to the attorneys as their fee.

22. Believing all of these statements to be true, and believing that the Trinidad contingent attorney's fee was a standard contingent attorney's fee, Mr. Greco agreed to co-counsel for the Trinidad arbitration at the reduced 20% fee, and the written signed contract to this effect, dated October 3, 2018, is attached and incorporated herein as Exhibit A.

23. Mr. Greco learned for the first time recently in 2023 that the statements by Mr. Quetglas that the Trinidad state court attorneys had no means of being paid in the state court action were false.

24. Mr. Greco was admitted *pro hac vice* in the Trinidad arbitration as co-counsel for the Trinidads, and he began spending extensive amounts of time reviewing discovery, preparing for the hearing, preparing exhibit books, and preparing a general pre-hearing Brief to be filed with FINRA. In preparing the Brief, Mr. Greco asked Mr. Quetglas what the contingency fee amount

was with regard to the Trinidads' arbitration, and Mr. Quetglas told him it was 30%. Mr. Greco therefore wrote in the draft pre-hearing Brief, in the attorney's fees section: "The Claimants have agreed to pay their attorneys 30% of the amount recovered in this case as a contingent attorney's fee." The draft containing this statement was sent to Mr. Quetglas for review before filing, and although Mr. Quetglas made other redline changes, including an addition to the same attorney's fee section, Mr. Quetglas did not change the above statement nor tell Mr. Greco that it was not true. Mr. Quetglas further stated in an email returning his redline changes: "See attached for comments. Looking good!" The Brief was thereafter filed by Mr. Quetglas with FINRA Dispute Resolution including the above statement regarding attorney's fees.

25. Prior to the beginning of the final hearing in the Trinidad arbitration, a mediation was held with one of the arbitration Respondents, Wells Fargo, in January, 2019. Mr. Greco attended and participated in the mediation as co-counsel for the Trinidads, and the case against Wells Fargo was settled, with Mr. Greco being paid a share of the attorney's fees from the settlement as co-counsel.

26. The Trinidad arbitration final hearings began in April 2019, in Puerto Rico and proceeding for 39 days (eight non-consecutive weeks) between April 2019 and September 2021, including multiple covid-related postponements. The hearings began with Mr. Minana, Mr. Quetglas, and Mr. Greco all working together as co-counsel, however in approximately 2020 a dispute arose between Mr. Minana and Mr. Quetglas which resulted in Mr. Quetglas filing a lawsuit against Mr. Minana, and multiple subsequent lawsuits and claims being filed against each other and their law firms. Mr. Greco was not a party to any of these lawsuits.

27. As a result of the dispute between Mr. Minana and Mr. Quetglas, the two of them

split up the pending cases they had been working on together, and Mr. Minana withdrew from
his role in the Trinidad arbitration which was in the middle of the final hearings.  Mr. Greco
continued as co-counsel in the Trinidad arbitration, and in other arbitrations for which he was
working as co-counsel with Mr. Quetglas, and further continued as co-counsel with Mr. Minana
on his cases.

28.  Regarding the Trinidad arbitration, Mr. Greco worked for many hundreds of hours
over many years on the case.  This included taking on lead attorney responsibility for all of the
most difficult aspects of the case.  For example, Mr. Greco was solely responsible for the cross
exam of the broker/advisor in the case which lasted approximately five full days of hearings.  He
also was solely responsible for cross-exam of multiple supervisors and management individuals,
and Respondent's expert witness, along with direct exam of the Trinidads' suitability and
supervision expert witness.  Mr. Greco also shared responsibility for the opening and closing
arguments, including the most important parts of the closing, which included a 117-page
PowerPoint slide deck prepared and presented by Mr. Greco.  This included the presentation of
excerpts of the most important testimony, presentation of excerpts from the most important
exhibits, and an extensive analysis of the applicable law.

29.  Although Mr. Greco did not officially appear as co-counsel in the related Trinidad
state court line of credit case, he did work with Mr. Quetglas on multiple related areas of the
state court case including discovery requests, and working with two different expert witnesses
related to their preparation of their expert reports, and their responses to Banco Popular's expert
reports.

30.  The Trinidad FINRA arbitration award was issued on October 21, 2021 with the

FINRA arbitration panel Ordering that Popular Securities pay the following amounts:

> "1. Respondent Popular is liable for and shall pay to Claimant Trinidad-García the sum of $4,229,298.02 in compensatory damages.
> 2. Respondent Popular is liable for and shall pay to Claimant Trinidad-Rodríguez the sum of $2,388,033.77 in compensatory damages.
> 3. Respondent Popular is liable for and shall pay to Claimants the sum of $258,771.46 in costs."

31.    Mr. Quetglas dealt with Popular Securities directly regarding the payment of the award without involving Mr. Greco.  According to what Mr. Quetglas told Mr. Greco at the time, Popular Securities paid the amounts due under the award to Mr. Trinidad-Garcia into court in the state court proceeding related to the line of credit case rather than paying it to Mr. Quetglas's Trust account or Mr. Trinidad-Garcia.

32.    Regarding the Trinidad-Rodriguez part of the award (paragraph "2" of the award excerpt above), Mr. Quetglas apparently received payment into his Trust Account and paid an attorney's fee to Mr. Greco, but Mr. Quetglas failed to pay Mr. Greco the amount of attorney's fee he was expecting based on the agreement of the parties.  (Mr. Greco was forced at the time by Mr. Quetglas to agree to keep the details of the payment confidential before Mr. Quetglas would make any payment, but will disclose them upon a waiver of the confidentiality agreement or Court Order). Mr. Greco did also receive a payment for reimbursement of his air and hotel costs from the Trinidads per the agreement.

33.    Mr. Quetglas advised Mr. Greco for the first time at this point that the contingent attorney's fee agreement with the Trinidads for the FINRA arbitration was that the fee would be calculated from the net (and not gross) amount recovered after payment by the Trinidads of any amount due on their lines of credit with Banco Popular.  Mr. Greco advised Mr. Quetglas that no one had ever disclosed this fact to him and he requested a copy of the Trinidad Retainer

Agreement which had never been given to him. Mr. Quetglas responded in writing that he would send a copy of the Retainer Agreement to Mr. Greco, but he never did so, despite a subsequent second request in writing by Mr. Greco.

34. Mr. Quetglas filed a federal court action in November, 2021 on behalf of the Trinidads and against Popular Securities and Banco Popular related to the same factual situation being addressed in the FINRA arbitration and the state court proceeding (P.R. U.S. District Case 3:21-cv-01529). In addition to federal law claims, Mr. Quetglas and the Trinidads alleged that all matters between the Trinidads and the Popular entities had been previously settled, including a settlement of the Trinidad FINRA arbitration before the arbitration award had been issued. Mr. Quetglas never disclosed the specifics of the alleged settlement to Mr. Greco, but upon information and belief, it would have included a significant payment of monies in the FINRA arbitration over the amount of the actual award, as well as relief from the lines of credit owed. If this was the case, then the amount owed to Mr. Greco as co-counsel in the Trinidad arbitration should be significantly higher than set out herein.

35. Mr. Greco was never paid any attorney's fees for the $4,229,298.02 arbitration award to Mr. Trinidad-Garcia in the FINRA arbitration ($4,488,069.00 if the costs awarded are included), despite the related state court and federal court actions being ultimately settled in 2023. Mr. Quetglas has never disclosed the details of the settlement of the Trinidad matters in 2023 to Mr. Greco despite request, and Mr. Greco only discovered that the settlement had occurred by being notified of it by Mr. Minana.

36. If the Trinidad settlement included the payoff of the lines of credit for the Trinidads and the payment out of court of the arbitration award monies, then Mr. Greco is owed at least

$269,284.00 in fees from the Trinidad arbitration (20% of 30% of the Trinidad-Garcia award amount), however, upon information and belief, Mr. Quetglas has wrongfully converted those funds by paying them to himself out of his attorney trust account.

37.    Although he did not know the details of the settlement, Mr. Minana notified Mr. Greco in February, 2023 that the Trinidad matters had been allegedly settled, and he further sent Mr. Greco a copy of the Trinidad retainer fee agreement that had apparently been previously filed/produced in the litigation between Mr. Quetglas and Mr. Minana.  (Mr. Quetglas had promised in writing to send the fee agreement to Mr. Greco the prior year but he never did so.) This was the first time that Mr. Greco had seen the Trinidad fee agreement which referenced the various additional ways that the Trinidad state court attorneys were being paid (contrary to the prior false statements of Mr. Quetglas), and further referenced that attorney's fees were to be calculated after deductions for lines of credit owed (a fact that had been hidden from Mr. Greco by Mr. Quetglas).

38.    Because Mr. Greco's agreement to reduce his fee percentage from one-third to 20% of the overall attorney's fees was fraudulently obtained based on Mr. Quetglas's misstatements about the Trinidad state court attorneys' fees, Mr. Greco is entitled to be paid pursuant to the general co-counsel verbal agreement discussed above one-third of 30% of the monies paid by Popular Securities in the Trinidad FINRA arbitration, estimated to be $444,319.00.

39.    Mr. Greco has also not been paid any attorney's fees by Mr. Quetglas in another large FINRA arbitration in which he worked as co-counsel – the Aguayo arbitration.  This was a FINRA arbitration filed against UBS by Maria T. Medina de Aguayo and Maribel T. Aguayo Medina, case No. 15-03100.

-13-

40. Mr. Greco was asked by Mr. Minana and Mr. Quetglas to join as co-counsel in the Aguayo arbitration in mid-2019 under the same agreement to share attorney's fees equally three ways, and he was admitted *pro hac vice* as co-counsel in July, 2019, and subsequently filed a Notice of Appearance as co-counsel in the case.

41. The final hearing in the Aguayo arbitration was ultimately set for March 16, 2020, and Mr. Greco spent significant amounts of time preparing for the final hearing, drafting and filing pleadings, and arguing various pre-hearing motions before the arbitration panel by telephone conference. In addition to appearing and arguing various Motions, Mr. Greco also reviewed all document production in the case, prepared exhibit books, prepared for witness examination, drafted various pleadings and Briefs, and worked with co-counsel and opposing counsel regarding the scheduling of witnesses. According to the Briefs filed in the Aguayo arbitration by Mr. Quetglas, the contingent attorney's fee in the Aguayo arbitration was 33%.

42. The final hearing for the Aguayo arbitration was postponed shortly before it was to begin in March, 2020 due to the covid epidemic, and final arbitration hearing dates were scheduled and then postponed for various dates thereafter, ultimately finally being set in June, 2023.

43. During the pendency of the Aguayo postponements and delays, Mr. Minana withdrew as co-counsel due to the dispute with Mr. Quetglas, but Mr. Greco continued as co-counsel with Mr. Quetglas. A Zoom mediation of the arbitration claims was scheduled and took place on February 10, 2022 which was attended by Mr. Quetglas and Mr. Greco. The case did not settle on that date, but discussions apparently continued regarding settlement between Mr. Quetglas and UBS. Another attorney from QLO contacted Mr. Greco and an expert witness for

-14-

the client by email in November, 2022 stating that they were still working on trying to settle the Aguayo arbitration, and asking if Mr. Greco and/or the expert had any outstanding costs invoices to be paid.

44.  The Aguayo arbitration ultimately settled in 2023, but Mr. Quetglas never told Mr. Greco about the final settlement until Mr. Greco raised the issue of preparing for the upcoming hearing in April, 2023.  Mr. Quetglas has not disclosed the amount of the settlement to Mr. Greco despite request, and he has refused to pay Mr. Greco any amount in attorney's fees despite having no legal basis for refusing to do so.  Upon information and belief, Mr. Quetglas has not held Mr. Greco's share of his Aguayo attorney's fee in Mr. Quetglas's attorney trust account, but instead has paid Mr. Greco's fees to himself in violation of the contracts between the parties, Mr. Quetglas's fiduciary duties, and Mr. Greco's rights.

45.  FINRA has a public Brokercheck system which sets out online complaints against registered brokers and the settlements of those complaints.  FINRA's public Brokercheck Report shows that FINRA arbitration 15-03100 (the Aguayo arbitration) had a "Settlement Amount" of $2,100,000.00.  If this is correct, the attorneys fee at 33% would be $693,000.00, and Mr. Greco's agreed one-third of that fee would be $231,000.00 which has been unlawfully converted by Mr. Quetglas.

46.  Mr. Quetglas has also refused to pay to Mr. Greco one other fee owed from a FINRA arbitration for which Mr. Greco was asked to join as co-counsel with the same one-third of the attorney's fee agreement as the other cases.  This was FINRA arbitration 18-01873 (the Perez Colon arbitration).  Mr. Greco was admitted *pro hac vice* for this arbitration on September 30, 2019, and he began reviewing the documents of the case and preparing for the final hearings.

-15-

47.  The Perez Colon arbitration ultimately was settled before its final hearing, and upon information and belief, the settlement amount was paid to Mr. Quetglas's attorney trust account. Mr. Quetglas, however, never paid Mr. Greco his agreed one-third of the attorney's fee.

48.  Mr. Quetglas was well aware that Mr. Greco was entitled to one-third of the Perez Colon attorney's fee because he called Mr. Greco on March 17, 2021 to discuss the payment of the fee for Perez Colon.  Mr. Quetglas stated that he thought Mr. Greco should accept a smaller percentage of the fee than one-third because Mr. Greco had not done as much work on the case as others, and requested that Mr. Greco agree to reduce the fee to 20% of the attorney's fee.  Mr. Greco agreed to this reduction in an effort to keep a good working relationship with Mr. Quetglas who was co-counsel with Mr. Greco in the ongoing Trinidad and Aguayo arbitrations at that time.  Mr. Quetglas told Mr. Greco that he and Mr. Minana would each pay Mr. Greco half of the 20% fee owed shortly, however Mr. Greco was never paid anything for the Perez Colon case, and Mr. Minana has provided documentation showing the entire settlement amount was paid to Mr. Quetglas and not Mr. Minana.  Mr. Quetglas has therefore breached the agreement to pay Mr. Greco the reduced attorney's fee amount.

49.  Upon information and belief Mr. Quetglas has paid himself Mr. Greco's fee regarding Perez Colon out of his attorney trust account which was an unlawful conversion.  Mr. Greco estimates that he is owed approximately $44,000.00 in fees for the Perez Colon arbitration.

50.  After Mr. Quetglas and Mr. Minana split their cases in 2020/2021, Mr. Greco also continued to work with Mr. Minana on various FINRA arbitrations and related litigation, and Mr. Minana has paid Mr. Greco all attorney's fees due to Mr. Greco under the co-counsel

agreement and contract on those matters upon their resolution.

51.    During the pendency of the Trinidad, Aguayo, and Perez Colon arbitrations, while Mr. Quetglas and Mr. Greco were working extensively together as co-counsel, Mr. Quetglas never raised any concerns or complaints regarding Mr. Greco's services as co-counsel in the cases.  Mr. Greco and Mr. Quetglas also socialized together outside of their working relationship, and Mr. Greco was invited multiple times to Mr. Quetglas's home.

52.    After Mr. Quetglas admitted that the Aguayo arbitration was settled in April, 2023, he agreed to discuss resolution of the various fees owed to Mr. Greco, although he insisted that all discussions be kept confidential.  Despite extensive efforts on Mr. Greco's part, as of the time of the filing of this Complaint, Mr. Quetglas has not paid Mr. Greco any of the attorney's fees owed in the three arbitrations which are discussed above.

53.    To the extent that any dispute existed with regard to Mr. Greco being entitled to payment of the three attorney's fees above, then Mr. Quetglas, as a licensed attorney and officer of the Court, should have at a bare minimum held those disputed fees in his or his firm's attorney trust account as a fiduciary after the settlement monies were paid by the Respondents in the arbitration/litigation.  Instead, upon information and belief, Mr. Quetglas has paid Mr. Greco's share of the fees to himself or his firm for his personal or business use.  This wrongful conversion of Mr. Greco's monies is a breach of good faith and a breach of contract.  It further was deceitful and was done with wanton disregard for the property of Mr. Greco.

54.    As set out above, Mr. Quetglas and/or QLO owe Mr. Greco and/or GG the following estimated amounts of attorney's fees from the three arbitrations, and Mr. Greco has been damaged in those amounts:

| | | |
|---|---|---|
| 1. Trinidad | $444,319.00 | |
| 2. Aguayo | $231,000.00 | |
| 3. Perez Colon | $44,000.00 | |
| **Total** | **$719,319.00** | |

55. Mr. Greco alleges and believes that the contracts alleged herein were made with him personally and damages were incurred by him personally, but alternatively to the extent that GG is also a party to the contracts and has suffered damages under the claims herein, GG has assigned all related rights, claims and causes of action to Mr. Greco.

**Count I.**
**Breach of Contract**

56. The allegations contained in paragraphs 1 through 55 are re-alleged and incorporated herein.

57. The above-referenced agreements relating to Mr. Greco working as co-counsel in the Trinidad, Aguayo, and Perez Colon FINRA arbitrations were written and oral contracts between Mr. Greco and Mr. Quetglas and Mr. Minana. Defendants have breached those contracts by failing to pay Mr. Greco the attorney's fees agreed and owed in those cases which were received by Defendants and apparently paid to Mr. Quetglas. Defendants further had a duty to act in good faith in their performance of the contracts, and they have breached said duty by their refusal to pay Mr. Greco the fees due, and by Mr. Quetglas paying himself or his law firm the monies.

58. By their aforesaid action and inaction, Defendants breached their express and implied oral and written contracts with Plaintiff and/or GG, and as a direct and proximate result, Plaintiff and/or GG incurred $719,319.00 in damages, together with interest, costs, and reasonable attorney's fees.

**Count II.**
**Conversion**

59. The allegations contained in paragraphs 1 through 58 are re-alleged and incorporated herein.

60. Conversion is a wrongful assumption or exercise of the right of ownership over property belonging to another in denial of or inconsistent with the owner's rights. The conversion alleged herein further is a violation of P.R. Laws Title 31 § 5121 which allows for recovery of a thing that is received without a right to claim it.

61. Mr. Quetglas and QLO violated P.R. Laws Title 31 § 5121 and wrongfully exercised assumption of authority over said monies owed to Mr. Greco as co-counsel in the three FINRA arbitrations, thereby depriving Mr. Greco and/or GG of the possession of those monies, in denial of and inconsistent with their rights, which has directly and proximately caused Mr. Greco to be damaged in the amount of $719,319.00, in addition to interest, costs, and reasonable attorney's fees.

**Count III.**
**Fraud and Fraudulent Inducement**

62. The allegations contained in paragraphs 1 through 61 are re-alleged and incorporated herein.

63. As set out above, Mr. Quetglas fraudulently induced Mr. Greco to reduce his co-counsel fee amount in the Trinidad FINRA arbitration based on false material statements of fact made intentionally and knowingly by Mr. Quetglas, and by intentional omission and hiding of facts. Mr. Greco relied on those false material statements and omissions of fact, resulting in the damages set out herein.

-19-

64. As a direct and proximate result of Mr. Quetglas's and QLO's aforesaid fraudulent conduct, Mr. Greco and/or GG have incurred damages of $719,319.00 together with interest, costs, and attorney's fees.

## Count IV.
## Breach of Fiduciary Duty

65. The allegations contained in paragraphs 1 through 64 are re-alleged and incorporated herein.

66. As a licensed attorney and officer of the Court, Mr. Quetglas was a fiduciary with regard to all settlement monies paid into his or his firm's attorney trust account. Mr. Quetglas owed his clients and his co-counsel the fiduciary duties of good faith, fair dealing, trust, and integrity in the receipt of monies deposited into the attorney trust account(s) and the payment of any monies out of the attorney trust account(s). Mr. Quetglas breached his fiduciary duties to Mr. Greco by paying monies owed to Mr. Greco out of the attorney trust account to Mr. Quetglas or his law firm in a blatant act of self-dealing, resulting in the damages to Mr. Greco and/or GG set out herein.

67. As a direct and proximate result of the Defendants' aforesaid conduct and breaches of fiduciary duties, Plaintiff incurred damages of $719,319.00 together with interest, costs, and attorney's fees. Defendants, as fiduciaries, further owe Plaintiff an accounting of all monies received and distributed in relation to the three subject arbitrations.

## Count V.
## Attorney's Fees

68. The allegations contained in paragraphs 1 through 67 are re-alleged and incorporated herein.

69.  Pursuant to PR Rule of Civil Procedure 44.1(d): "[i]n the event any party or its lawyer has acted obstinately or frivolously, the court shall, in its judgment, impose on such person the payment of a sum for attorney's fees which the court decides corresponds to such conduct." PR Rule of Civil Procedure 44.1(d). "[T]he award of attorney[s'] fees to the prevailing party depends exclusively on the decision of the presiding judge with regard to whether or not the losing party, or his counsel, acted in a 'frivolous or obstinate manner.'" *IOM Corp. v. Brown Forman Corp.,* 627 F.3d 440, 451-52 (1st Cir. 2010) (internal quotation marks and citation omitted).

70.  The Defendants acted in a frivolous and obstinate manner by refusing to pay the Plaintiff and/or GG the attorney's fees earned by Plaintiff and/or GG and due to them despite not having any legal or factual basis for this refusal, and further by instead, upon information and belief, paying those attorney's fees out of Defendants' attorney trust account to Defendants in a blatant act of self-dealing.

71.  Accordingly, the Defendants should be ordered to pay Plaintiff reasonable attorney's fees in regard to this case.  Although W. Scott Greco is representing himself *pro se* in this case, he will have to spend an extensive amount of professional time and effort prosecuting this case. Plaintiff therefore alleges that an attorney's fee of 33% of the amount of compensatory damages is a reasonable attorneys fee and it should be awarded due to Defendants' frivolous and obstinate actions forcing this Complaint to be filed and the litigation prosecuted.

### Jury Demand

Plaintiff hereby demands a trial by jury with regard to the claims and Counts herein.

-21-

**Relief Requested**

WHEREFORE, for the foregoing reasons, Plaintiff W. Scott Greco requests that a judgment be rendered against Defendants, jointly and severally, based on the foregoing Counts, for the following amounts and requirements:

      a.  That Plaintiff be awarded a judgment against the Defendants for compensatory damages of $719,319.00, or a greater amount as determined by the trier of fact;

      b.  Interest assessed up to the time of payment of the judgment;

      c.  Punitive damages of $2,000,000.00;

      d.  That Defendants be Ordered to provide an accounting to Plaintiff of all monies received and distributed from the three subject arbitrations;

      e.  Those costs, filing fees, and attorney's fees incurred by Plaintiff in order to prosecute this action;

      f.  Such other further relief to which Plaintiff may be justly entitled as determined by the Court and trier of fact.

                                           W. SCOTT GRECO,
                                           Plaintiff

Dated: Jan 17, 2024

_____
W. Scott Greco, Plaintiff *pro se*
GRECO & GRECO, P.C.
1300 Old Chain Bridge Road
McLean, Virginia  22101
Telephone (703) 821-2777
Facsimile (703) 893-9377
wsgreco@grecogrecolaw.com